IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

LARRY M. JONES,                          §
                                         §
                        Plaintiff,       §
                                         § Civil Action No. 3:10-CV-2342-D
VS.                                      §
                                         §
MICHAEL J. ASTRUE,                       §
COMMISSIONER OF SOCIAL                   §
SECURITY,                                §
                                         §
                        Defendant.       §

<u>MEMORANDUM OPINION</u>

Plaintiff Larry M. Jones ("Jones") brings this action under § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for a period of disability and disability insurance benefits. For the reasons that follow, the court affirms in part, and vacates and remands in part, the Commissioner's decision.

I

On July 14, 2006 Jones applied for a period of disability and disability insurance benefits, alleging disability due to HIV/AIDS, fatigue, back pain, skin rashes, pneumonia, bronchitis, and depression. After his application was denied initially and on reconsideration, Jones requested a hearing before an administrative law judge ("ALJ"). In a November 28, 2008 decision, the ALJ found that Jones had been disabled since January 1, 2006 but that his disability had ended on January 1, 2007. The Appeals Council remanded the decision on April 16, 2009, and, after two supplemental hearings, the ALJ issued a decision on February

9, 2010 determining that Jones was disabled as of January 1, 2006 but that the disability had ended on January 2, 2007.  Jones's request for review of the ALJ's decision was denied by the Appeals Council, and the ALJ's decision became the final decision of the Commissioner.

The ALJ followed the five-step sequential process prescribed in 20 C.F.R. § 404.1520(a)(4) and concluded that (1) Jones was not presently working; (2) he had severe HIV, AIDS, degenerative disc disease, and mood disorder impairments; (3) Jones's impairments were not so severe in combination as to meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 from January 1, 2006 until the present; (4) the impairments were yet severe enough to prevent Jones from doing his past relevant work as a warehouseman; and (5) Jones could not perform relevant work that existed in significant numbers in the national economy from January 1, 2006 through January 1, 2007, making him disabled during that time.  The ALJ then applied the eight-step process in § 404.1594(f) to determine that medical improvement occurred as of January 2, 2007 such that Jones could perform a significant number of jobs in the national economy and was no longer disabled as of that date.  R. 23.

Jones now seeks judicial review on the following five grounds:[1] first, the ALJ should have applied a preponderance of the evidence standard in determining whether his impairments equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P,

---

[1]The arguments are presented in a different order in Jones's briefing.  The court has arranged the arguments in a manner that better reflects the order of analysis in the eight-step inquiry.

Appendix 1; second, the ALJ did not properly consider medical expert ("ME") opinion evidence when determining whether his impairments were severe enough to equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; third, the ALJ failed to cite medical evidence indicating that an improvement occurred between January 1, 2007 and January 2, 2007; fourth, the ALJ did not provide a detailed enough justification before giving little weight to a treating physician's opinion on Jones's residual functional capacity ("RFC"); and, fifth, the ALJ failed to demonstrate that the medical improvement resulted in an increased ability to work, because the ALJ asked a faulty hypothetical question to a vocational expert ("VE") and the VE did not explain what percentage of the jobs mentioned would match Jones's RFC. The Commissioner responds that the ALJ did not err in weighing the opinions of the MEs or the treating physician, and that the ALJ properly established a medical improvement that increased Jones's ability to work and enabled him to engage in substantial gainful activity.

## II

### A

The court's review of the Commissioner's decision is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards to evaluate the evidence. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam). "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or

finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnotes omitted).

"The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]." *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984) (citations omitted). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez*, 64 F.3d at 173. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990) (per curiam)). "To make a finding of 'no substantial evidence,' [the court] must conclude there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (citation omitted). Even if the court should determine that the evidence preponderates in the claimant's favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). The resolution of conflicting evidence is for the Commissioner rather than for the court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam).

B

For purposes of social security determinations, "disability" means an "inability to

- 4 -

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2006). Under the five-step sequential inquiry the Commissioner considers whether (1) the claimant is presently engaged in substantial gainful activity, (2) the claimant's impairment is severe, (3) the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) the impairment prevents the claimant from doing past relevant work, and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy. *See, e.g., Leggett*, 67 F.3d at 563-64 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 404.1520(a)(4) (2011). "The burden of proof is on the claimant for the first four steps, but shifts to the [Commissioner] at step five." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam)). At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam).

## C

A claimant can sometimes be found to have had a disability at one point in time but no longer to be disabled due to medical improvement. *See* 42 U.S.C. § 423(f)(1) (permitting cessation of benefits upon proof of medical improvement and ability to engage in substantial gainful activity). Medical improvement is "any decrease in the medical severity of [the

claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [claimant was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1) (noting that the changes must be in the symptoms, signs, and/or laboratory findings associated with the impairment). In proceedings to terminate disability benefits because of medical improvement, the ultimate burden of proof lies with the Commissioner. *See Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991) (per curiam). Termination proceedings are governed by the following eight-step sequential process:

> (1) Is the claimant engaged in substantial gainful activity? (If so, the disability has ended.)
>
> (2) If not, does the claimant have an impairment [or] combination of impairments which meets or equals the severity of an impairment listed in Appendix 1? (If so, the disability is continuing.)
>
> (3) If not, has there been medical improvement?
>
> (4) If there has been medical improvement, is it related to the claimant's ability to do work?
>
> (5) If there has been no medical improvement, or if the medical improvement is not related to the claimant's ability to do work, is one of the exceptions to medical improvement applicable? (If not, the disability is continuing.)
>
> (6) If there has been medical improvement related to the claimant's ability to do work, or if one of the first group of exceptions is applicable, is the combination of impairments severe? (If not, the disability has ended.)
>
> (7) If so, is the claimant able to engage in past relevant work? (If so, the disability has ended.)
>
> (8) If not, is the claimant able to perform other substantial

gainful activity?

*Id.* at 944 n.1 (citing 20 C.F.R. § 404.1594(f)) (characterizing steps 7 and 8 as part of the "substantial gainful activity" prong analysis of 42 U.S.C. § 423(f)).

The instant case, of course, does not involve a termination of benefits already awarded. The ALJ determined that Jones was disabled, albeit for a "closed period" of time. *See, e.g., Waters v. Barnhart*, 276 F.3d 716, 719 (5th Cir. 2002) (defining "closed period" as where "a new applicant for disability benefits was disabled for a finite period of time which started and stopped prior to the date of [ALJ's] decision"). Nevertheless, in deciding this closed period case, the court will apply the burden of proof and eight-step process used in a termination case. *See id.* at 719 (applying 42 U.S.C. § 423(f) framework, generally, and *Griego*'s burden of proof allocation to closed period case). Because the *Waters* panel held that the Commissioner has the burden of demonstrating in a closed period case, as in a termination case, that the disability has ceased, the court will follow this allocation of the burden. *See id.* (holding that medical improvement prong of 42 U.S.C. § 423(f) applied). The court will also follow the eight-step process in determining whether there is reversible error in the ALJ's determination that Jones is able to perform other substantial gainful activity. Although the Fifth Circuit has yet to decide whether the eight-step process provides the proper analytical framework for the second prong of § 423(f) in a closed period case, when the *Waters* panel extended the medical improvement standard of the first prong of § 423(f) to closed period cases, it observed that "in closed period cases, the ALJ engages in

the same decision-making process as in termination cases."[2]  *Id.*  Moreover, several district

courts in this circuit have noted that both types of cases concern a medical improvement

followed by a termination of benefits and have applied the eight-step process to closed period

cases as generally applicable to any situation where an improvement is followed by

termination of benefits.[3]  The court will therefore follow in this case the eight-step analysis

for determining whether a claimant can engage in substantial gainful activity with medical

---

[2]In *Waters* the ALJ had applied the five-step inquiry (usually used for making an *initial* determination of disability) at two different points in time—the beginning and end of the alleged closed period—to determine when the claimant became disabled (i.e., at the date when the claimant fulfilled the requirements of the five-step inquiry) and ceased to be disabled (i.e., at the date when the claimant ceased to fulfill the requirements of the five-step inquiry).  *See Waters*, 276 F.3d at 718.  In the context of the arguments presented on appeal, it was unnecessary for the *Waters* panel to decide whether the normal five-step sequential process for making disability determinations applied to termination cases or to closed period determinations.  *Waters* only required that the ALJ place the burden on the Commissioner, in whatever medical improvement analysis was done, to prove that the claimant was no longer disabled.  Therefore, although several courts have decided to apply to closed period cases the eight-step process used in termination cases, *see Chavis v. Astrue*, 2010 WL 624039, at *6 (N.D.N.Y. Feb. 18, 2010) (listing district court cases across multiple circuits adopting eight-step analysis from 20 C.F.R. § 404.1594(f) in determining termination of disability status in closed period cases), the Fifth Circuit has not determined whether to do so.

[3]*See Van Allen v. Astrue*, 2010 WL 3766690, at *5-6 (N.D. Tex. Sept. 28, 2010) (Lane, J.) (applying eight-step process in closed period case, reasoning that "[t]he determination of a closed period of disability entails both a disability and a termination"); *McCarthy v. Astrue*, 2010 WL 1489913, at *4-5 (E.D. La. Mar. 19, 2010) (Mag. Judge recommendation) (stating eight-step analysis as the prescribed method to determine whether second prong of § 423(f) has been met); *Vicknair v. Astrue*, 2009 WL 2949764, at *4 (N.D. Tex. Sept. 15, 2009) (Lane, J.) (applying eight-step process to closed period case, noting that once medical improvement is shown, Commissioner determines claimant's ability to perform substantial gainful activity under the later steps found in 20 C.F.R. § 1594(f)); *Campos v. Astrue*, 2009 WL 47126, at *6 (S.D. Tex. Jan. 6, 2009) (stating the eight-step process as applicable to determination whether disability continues in closed period case).

improvement, as prescribed by 20 C.F.R. § 404.1594(f).

When determining the propriety of a decision of "not disabled," this court's function is to ascertain whether the record considered as a whole contains substantial evidence that supports the final decision of the Commissioner, as trier of fact. The court weighs four elements of proof to decide if there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) age, education, and work history. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)). "The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley*, 67 F.3d at 557. "If the ALJ does not satisfy [this] duty, [the] decision is not substantially justified." *Id.* Reversal of the ALJ's decision is appropriate, however, "only if the applicant shows that he was prejudiced." *Id.* The court will not overturn a procedurally imperfect administrative ruling unless the substantive rights of a party have been prejudiced. *See Smith v. Chater*, 962 F. Supp. 980, 984 (N.D. Tex. 1997) (Fitzwater, J.).

## III

Because the eight-step process is sequential, making it possible to moot the necessity for decisions at later steps, the court first addresses Jones's argument that the ALJ should have found under a preponderance of evidence standard that his impairments equaled Listing 1.04 (disorder of the spine) and Listing 14.08 (HIV infection) of 20 C.F.R. Part 404, Subpart

P, Appendix 1.[4] *Cf.* Clarification of Evidentiary Standard for Determinations and Decisions, 73 Fed. Reg. 76,940-02, 76,941 (Dec. 18, 2008) ("Adjudicators at each level of the *administrative review process*, including the Appeals Council, consider whether a claimant has proven his claim using an evidentiary standard called the 'preponderance of the evidence' when they make a determination or decision." (emphasis added)).[5] This appears to be an argument directed at step two of the eight-part inquiry. *See* 20 C.F.R. § 404.1594(f)(2) ("[D]o you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in [20 C.F.R. Part 404, Subpart P, Appendix 1]? If you do, your disability will be found to continue.").

The ALJ did not explicitly state whether she was applying a particular standard during step two of the eight-step inquiry. Rather, Jones assumes that the ALJ applied an incorrect standard based on his perception that two MEs opined in favor of finding that his

_____

[4]As noted *supra* at § I, the ALJ determined that Jones was disabled from January 1, 2006 through January 1, 2007. Therefore, to the extent Jones complains of the ALJ's failure to find that his impairments equaled Listings 1.04 and 14.08 during that period, the argument is moot because both parties agree that he was disabled for that period. The court only reviews the ALJ's determination regarding the medical equivalence of impairments from January 2, 2007 onward.

[5]Under *Waters*, 276 F.3d at 719, however, the Commissioner has the burden of proof in determining cessation of disability status. Although Jones included in his opening brief a block quotation from *Griego* noting the burden of proof, it was not until his reply brief that Jones raised the argument that the ALJ failed to apply the correct burden of proof. *See* P. Reply Br. 2. The court will not consider an argument presented for the first time in a reply brief. *See, e.g., Jacobs v. Tapscott*, 2006 WL 2728827, at *7 (N.D. Tex. Sept. 25, 2006) (Fitzwater, J.) (citing *Senior Unsecured Creditors' Comm. of First RepublicBank Corp. v. FDIC*, 749 F. Supp. 758, 772 (N.D. Tex. 1990) (Fitzwater, J.)), *aff'd*, 277 Fed. Appx. 483 (5th Cir. 2008).

impairments equaled Listing 1.04 and Listing 14.08, while only one ME opined against. Regardless, this court is not part of the administrative review process; the substantial evidence standard, not the preponderance of evidence standard, governs here. *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."). Although it is possible to remand a decision based on an error of law, this does not mean that Jones can recast his disagreements over the ALJ's weighing of the factual evidence as a legal question of misapplied standards, absent more concrete evidence that the ALJ actually applied one legal standard instead of another. Jones can offer no more than supposition that the ALJ applied the wrong legal standard in determining step two, based on his subjective opinion of which side the evidence clearly favored. The court therefore holds that Jones has failed to establish a legal error that warrants reversal, and it applies the substantial evidence standard to evaluate the ALJ's determination regarding whether Jones's impairments equaled Listings 1.04 or 14.08.

Three MEs testified regarding Jones's HIV and musculoskeletal impairments. John Vorhies, M.D. ("Dr. Vorhies"), testified in a July 7, 2009 hearing that Jones's limitations in HIV and lumbar degenerative disc disease and joint disease had never reached the point where they equaled Listing 1.04 or Listing 14.08. R. 60-61. Camille Hemlock, M.D. ("Dr. Hemlock"), testified at a November 19, 2009 hearing that Jones's impairments had equaled Listings 1.04 and 14.08 since 2006, even though there was some evidence of gaps in treatment. R. 46, 49.

The parties dispute whether Rima Bishara, M.D. ("Dr. Bishara"), testified in favor of

Jones because many parts of her testimony were marked as inaudible in the hearing transcript. Dr. Bishara testified that Jones's impairments might have equaled the HIV listing from April 2006 to September 2006, with about six months of recovery time after that, then agreed with the ALJ's suggestion that the impairments equaled the HIV listing only from April 2006 until about December 2006. R. 128. But this time period is irrelevant given the scope of this review; Dr. Bishara offered no opinion about whether Jones's impairments equaled the HIV listing during any period past January 2, 2007. Therefore, even by Jones's argument, which emphasizes the number of MEs testifying for and against, there is substantial evidence that Jones's impairments did not equal the HIV listing.

Although the question whether Jones's impairments equaled the spinal disorder listing is more ambiguous, the court holds that substantial evidence supports the ALJ's finding that Jones did not meet the listing. The transcript of Dr. Bishara's testimony reflects that the ALJ asked this question: "And then after that his first the record suggests equal the muscular skeletal as of six months prior to October?" to which Dr. Bishara answered, "Yes." *Id.* It is unclear what the ALJ meant by the question that is garbled on the record. Jones urges the court to interpret the question as acknowledging that Jones's impairments equaled the musculoskeletal listings since six months prior to October 2006. The Commissioner cites a different part of the hearing transcript to argue that Dr. Bishara found that Jones's impairments fell short of equaling Listing 14.08. At this part the ALJ asked Dr. Bishara, "[D]id you find that he had a back impairment where he had that met or equaled the listing there?" and Dr. Bishara responded, "Not based on the record that I have[.]" R. 124. Other

parts of Dr. Bishara's testimony also cast doubt on whether she found that Jones's impairments equaled Listing 1.04. For example, after a discussion about the evidence on file regarding Jones's back impairments, the ALJ asked, "Does the record reflect the distribution of pain or the limitation of motion, the other things that are required?" and Dr. Bishara replied, "That's exactly what I'm saying. It does not." R. 126. And directly after Dr. Bishara responded to the garbled question on page 128 of the record, Jones's attorney asked a follow-up question, inquiring whether Dr. Bishara had remembered to consider X-ray evidence from June 2006 showing moderate to severe degenerative disc disease. The attorney asked, "So if [Jones] didn't equal the listing back then, he would have at least had significant problems from that?" R. 128. Unless the response to the earlier garbled question was unfavorable to Jones, it is doubtful that Jones's attorney would have attempted to elicit from Dr. Bishara an opinion on the significance of Jones's problems under the assumption that Jones did not equal the listing at the time. On the other hand, after a largely inaudible discussion about Dr. Bishara's opinion about whether Jones met or equaled Listing 1.04, the ALJ asked, "When you said it probably equals, what functional limitations that are in the record are you relying [on] to say that it probably equals?" R. 127. Although Dr. Bishara's answer is inaudible, the fact that the ALJ asked such a question suggests that at some point Dr. Bishara opined that Jones's limitations "probably equaled" Listing 1.04. Nevertheless, there is some doubt as to whether two MEs would unequivocally support the view that Jones's impairments equaled Listing 14.08 after December 2006.

Even assuming *arguendo* that Dr. Bishara concluded that Jones's impairment equaled

Listing 1.04 after January 1, 2007, the ALJ's finding is supported by at least substantial evidence if not a preponderance of evidence. In addition to evidence in the form of ME opinions, Jones rated his back pain as a 6 on a scale of 0 to 10 on January 3, 2007 and reported a pain level of 0 on March 23, 2007. R. 19, 945, 960. Progress notes from July 27, 2007, September 18, 2007, January 23, 2008, March 26, 2008, May 9, 2008, July 7, 2008, September 5, 2008, and December 5, 2008 indicated that although Jones had reported back pain,[6] his gait and range of motion were normal. R. 863, 879, 893, 929, 940, 1222, 1229, 1299. The attending consultant's notes from February 28, 2008 indicate "lumbar spine normal" and "can heel & toe walk." R. 843. An electrodiagnostic report from the same date indicates that "[a]ll sensory and motor nerve conduction studies were normal." R. 846. Although on February 20, 2009 Jones rated his pain as 8 on a scale of 1 to 10, R. 1219, on April 14, 2009 the examining physician found "no significant abnormalities" in the musculoskeletal system, noting, "Neurovascular intact. Range of motion normal," and making no mention of back pain. R. 1097-98. Hanna J. Abu-Nassar, M.D. ("Dr. Abu-Nassar"), examined Jones on April 3, 2009 and estimated that he could walk one-half of a block at a time, stand 30 minutes per hour, sit 45 minutes per hour, lift 10 pounds level and over head, carry 15 pounds, bend, and climb 8 steps at a time. R. 1235. Dr. Abu-Nassar also noted that, although Jones had a limp to the right and could not walk on his heels and in

_____

[6]On September 18, 2007 and January 23, 2008 Jones rated his pain as 6 on a scale of 1 to 10. R. 928, 1229. On May 9, 2008 and September 5, 2008 Jones rated his pain as 7. R. 878, 1221. On July 7, 2008 Jones rated his pain from a herniated disc as 5. R. 1223. On December 5, 2008 Jones rated his pain as 8. R. 1298.

tandem, Jones did have the ability to walk on his toes, get on and off the examination table normally, and move around the room normally. R. 1236. Dr. Abu-Nassar also noted that Jones had obtained a cane, but that Jones had done this on his own rather than in response to a physician's recommendation. R. 1234. Lanita Dawson-Jones, M.D. ("Dr. Dawson-Jones"), also examined Jones on April 3, 2009 and recorded that the limited examination revealed "mild lumbar levoscoliosis" and "varying degrees" of degenerative disc disease at all lumbar levels. R. 1239. Yet when evaluating Jones's actual abilities, Dr. Dawson-Jones noted as being normal all movements of the lumbar spine; the only abnormal movements noted elsewhere were that the forward flexion of the right leg and straight leg raising of the right leg were limited to 70 degrees rather than 90, flexion-extension of the right leg was at 120 degrees rather than 150, and lower extremity muscle weakness on the right leg was rated as 4 out of 5, where 5 is normal. R. 1240-41. Printouts dated June 19, 2009, June 25, 2009, and September 8, 2009 indicated a pain score of "10" for the back, *see* R. 1362, 1383, 1449, but there is no indication in the record of how these reported scores were obtained, whether they were substantiated by objective evidence of limitations, or whether this was Jones's subjective description. *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(D) ("[P]hysical findings must be determined on the basis of objective observation during the examination and not simply a report of the individual's allegation; e.g., 'He says his leg is weak, numb.'"); *cf.* R. 1363, 1385, 1450 (indicating that nurse recording the data did not need to intervene with mobility assistance, despite alleged maximum pain rating).

Accordingly, considering the record as a whole, the court is unable to conclude that

the ALJ's decision is not supported by substantial evidence, or that the ALJ failed to allocate properly the burden of proof. Although Jones rated his back pain at levels ranging between 0 and 10, which would indicate that he experienced increasing pain beginning in 2007, there is objective medical evidence (in the form of physician observations of actual ability and electrodiagnostic tests) to support the finding that his degenerative disc disease, nerve root compression, and lumbar stenosis did not cause loss of function (i.e., the loss of ability to ambulate effectively). Jones presented some objective evidence of degenerative disc disease and neuropathy through the nerve conduction and electromyogram test results, but the record evidence permitted the ALJ to find that there was insufficient showing of the "required loss of function for a musculoskeletal impairment," given that such loss of function must generally be shown by "inability to ambulate effectively on a sustained basis [i.e., for at least twelve months]." *See Audler v. Astrue*, 501 F.3d 446, 449 (5th Cir. 2007) (citing 40 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)) (internal quotation marks omitted). As defined in 40 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(B)(2)(b)(1), an inability to ambulate effectively is "defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." Although some 2009 examinations indicated that Jones could only walk about one-half of a block at a time before resting, *see* R. 1235, 1427, and Jones testified in a September 11, 2008 hearing that he could not go shopping on his own, *id.* at 116, Jones admitted in an April 6, 2009 interview with J. Lawrence Muirhead, Ph.D., a clinical psychologist, that he could use public transportation,

visit his mother,[7] and run errands, *id.* at 1245.  Although the definition in 20 C.F.R. Part 404, Subpart P, Appendix 1 § 1.00(B)(2)(b)(2) states that the inability to ambulate effectively includes the "inability to carry out routine ambulatory activities, such as shopping or banking" or "the inability to walk a block at a reasonable pace on rough or uneven surfaces," there is substantial evidence of Jones's functional abilities to support the ALJ's decision not to fully credit Jones's testimony or to conclude that, even with rest between one-half blocks, Jones could still walk one block at a reasonable pace.

In reaching his determination, the ALJ noted gaps in Jones's medical treatment, interpreting this as circumstantial evidence of the lack of severity of Jones's condition.  R. 19.  The ALJ also attached particular importance to the lack of objective evidence in the record that reflected the severity described in Listing 1.04.  *See* R. 16.  For example, she noted that there were no neurovascular abnormalities, *see* R. 846 (interpreting sensory and nerve conduction study results as "normal" and concluding that there was no evidence of peripheral neuropathy, although there was some evidence of chronic radiculopathy), and that, as recently as 2009, Jones had demonstrated normal range of motion in his lumbar spine when examined, *id.* at 16.  To demonstrate nerve root compression at a level of severity meeting Listing 1.04(A), it was necessary for Jones to show that his symptoms were characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor

---

[7]Jones resided with his mother at the beginning of the disability investigations, R. 43, but later moved out, *id.* at 1245.  There is no indication in the record whether Jones continued to visit others outside the home after his mother died in June 2009.

loss, sensory or reflex loss, and indication of limitation on the straight-leg raising test. *See* Listing 1.04A. Regardless how other parts of Dr. Bishara's testimony should be evaluated, it cannot be disputed that when the ALJ asked her whether the available record at the time September 11, 2008 reflected distribution of pain, limitation of motion, or other symptoms listed in Listing 1.04, Dr. Bishara clearly answered, "That's exactly what I'm saying. It does not." R. 126. Because there was no evidence of distribution of pain, limitation of motion, motor loss, or sensory or reflex loss, *see, e.g.*, R. 63, 126, 863, 879, 893, 929, 940, 1097-98, 1222, 1230, 1299, and only some evidence of limitation in straight-leg raising and flexion in the right leg, *id.* at 1240-41, substantial evidence supports the ALJ's finding that Jones's symptoms did not equal the level of severity described in Listing 1.04(A).

Furthermore, there is no record evidence—such as medically acceptable imaging, chronic nonradicular pain and weakness, and an inability to ambulate effectively under the definition given in § 1.00(B)(2)(b)—to indicate that Jones's lumbar spinal stenosis met Listing 1.04(C). As noted above, there was substantial evidence for the ALJ to find that Jones did not have an "inability to ambulate effectively" under the definition given in § 1.00(B)(2)(b), thereby supporting a finding that his impairment did not equal Listing 1.04(C).

Therefore, the Commissioner's decision at step two of the eight-step process is supported by substantial evidence, Jones has failed to establish that the ALJ applied the wrong standard in evaluating the record, and the decision is affirmed in this respect.

IV

Jones also challenges the ALJ's closed-period determination on the ground that the

ALJ failed to cite medical evidence to show that an improvement occurred between January 1, 2007 and January 2, 2007. This appears to be an argument directed at step three of the eight-step process (i.e., whether there has been a medical improvement).

"Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). Such a determination must be based on improvement in the "symptoms, signs and/or laboratory findings" associated with an impairment. *Id*. Symptoms are defined as "[the claimant's] own description of [his] physical or mental impairment." *Id*. § 404.1528(a). Signs are "anatomical, physiological, or psychological abnormalities which can be observed," apart from the claimant's statements, shown by medically acceptable laboratory diagnostic techniques. *Id*. § 404.1528(b). Laboratory findings are defined as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques." *Id*. § 404.1528(c).

Although the evidence does not pinpoint January 2, 2007 as the precise point in time when Jones's condition improved, objective medical evidence gleaned over 2007, coupled with Jones's subjective statements about his symptoms, supports the ALJ's finding that Jones's overall condition had improved over the course of 2006 to such an extent that, as of January 2, 2007, a medical improvement had occurred. *See, e.g.,* R. 22 (concluding that "claimant's statements concerning the intensity, persistence and limiting effects of [the alleged] symptoms are not credible beginning on January 2, 2007"). For example, on

January 3, 2007 an examining nurse practitioner recorded Jones's comment that he felt fine with HIV medication. R. 722. Dr. Bishara also opined at one point that, based on the record, Jones might have equaled the HIV listing from April 2006 until December 2006, R. 128, further suggesting that January 2, 2007 is a reasonable cutoff date. Furthermore, evidence of decreased severity in symptoms from early 2007 would support the ALJ in finding that Jones was already trending toward improved health sometime before January 2007, such that by January 2, 2007 he would have made noticeable improvement. For example, according to Kirk G. Jordan, M.D., a February 12, 2007 chest tomography revealed a "[s]ignificant improvement within the pulmonary parenchyma" since the previous visit. R. 770. Jones had frequent hospitalizations in 2006 for bacterial infections related to HIV, *see* R. 46, 62, but he did not need to be hospitalized in 2007, and he received more routine, outpatient services during that year, *id.* at 43. The ALJ also noted that, while Jones frequently complained in 2006 about fatigue, *see, e.g.*, R. 360, 364, 690, complaints of fatigue were not documented in 2007, *id.* at 20. The court therefore holds that the ALJ's finding of medical improvement is supported by substantial evidence.

Jones points to evidence that his CD4 count dropped at various points in 2009, that he received hospital treatment for recurrent pneumonia in 2009, that his back pain worsened over time, and that he continued to have memory impairments and irritability. Even so, there is substantial evidence to support the finding that, at least with respect to one impairment, Jones experienced a decrease in medical severity around January 2, 2007. "Medical improvement is *any* decrease in the medical severity of your impairment(s)." 20 C.F.R.

§ 404.1594(b)(1) (emphasis added). Even if Jones's back pain worsened over 2007, there is record evidence that his HIV impairment became less severe over the course of late 2006 and 2007. Therefore, the ALJ could have found that a medical improvement occurred as of January 2, 2007. There is no basis to disturb the ALJ's conclusion at this step of the disability closed-period inquiry, and the decision is affirmed in this respect.

## V

Jones also challenges the ALJ's RFC determination (first used for step four of the eight-step process),[8] contending that the ALJ committed reversible error when she determined that the opinions of her treating physician, Deborah Morris-Harris, M.D. ("Dr. Morris-Harris"), were entitled to "no significant weight" but did not adequately explain why. R. 22.

## A

Jones maintains that, under 20 C.F.R. § 404.1527(d)(2), the ALJ must "always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [the] treating source's opinion," and that a treating source's opinion on the nature and severity of a claimant's impairments, if "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with . . . other substantial evidence," must be given "controlling weight." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (internal

---

[8]*See* 20 C.F.R. § 404.1594(b)(4), (c)(2) (explaining that, at step four, the ALJ must assess whether medical improvement is related to ability to work by comparing the new RFC to the old RFC).

quotation marks and citations omitted); *id.* at 456 ("[A]n ALJ is required to consider each of the § 404.1527(d) factors before declining to give any weight to the opinions of the claimant's treating specialist."); *see also* 20 C.F.R. § 404.1527(d)(1)-(6) (listing five factors—examining relationship, treatment relationship, supportability, consistency, specialization—that must be weighed with any other factors brought to ALJ's attention).

The Commissioner responds that the ALJ's decision to give Dr. Morris-Harris' opinion no significant weight is justified because the evidence overall is contrary to Dr. Morris-Harris' opinions, and that *Newton* only requires the ALJ to discuss the § 404.1527(d) factors when favoring the testimony of a non-examining, non-specialty physician over that of the claimant's treating physician when the record does not contain competing first-hand medical evidence to support the ALJ's decision. The Commissioner argues in the alternative that the ALJ's discussion of the § 404.1527(d) factors is sufficient.

B

Although the court holds below that the ALJ committed *Newton*-type error that requires that the decision be vacated and remanded, it agrees at a threshold level that the ALJ was not obligated to give Dr. Morris-Harris' opinions controlling weight. Section 404.1527(d)(2) only permits a treating physician's opinion on the nature and severity of an impairment to carry controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). Some of the record evidence conflicts with Dr. Morris-Harris' opinion about Jones's abilities. Although Dr. Morris-Harris opined

on September 5, 2008 and June 22, 2009 that the side effects of the HIV medication would make regular job attendance difficult, R. 1028, 1306, other evidence in the record indicated that Jones felt "fine" on HIV medication on January 3, 2007 and did not experience weight loss, *id.* at 722, 1028, 1306, leading the ALJ to find that the HIV medication's side effect of diarrhea was not debilitating, *see id.* at 67 (relating ME's opinion that lack of weight loss indicates that problem was not significant). Dr. Morris-Harris also noted that Jones had chronic weakness and fatigue that could preclude him from working a full eight-hour day. R. 1028, 1306. The ALJ pointed to a dearth of recent evidence of fatigue and to Dr. Vorhies' testimony that Jones had anemia at about the same time that Jones reported fatigue. The ALJ found this to be persuasive evidence that the anemia might have caused the fatigue and that, because Jones's anemic condition had stabilized afterwards, *see, e.g.*, R. 1306 (indicating no anemia on September 22, 2009), fatigue was not a permanent problem, *id.* at 20. The ALJ also criticized the relative lack of evidence supporting the existence of fatigue, concluding that medical records would have revealed more frequent indications of fatigue than every two years if Jones had suffered from debilitating levels of fatigue. R. 20. Because contrary evidence exists and Dr. Morris-Harris' opinion is not in this respect "well-supported," the ALJ was not obligated to give controlling weight to Dr. Morris-Harris' opinions on fatigue, nausea, or diarrhea.

Dr. Morris-Harris also opined in a physical RFC capacity questionnaire dated June 21, 2009 that Jones would require occasional rest periods during the day, frequent flexibility to change positions, and occasional flexibility to elevate his legs, and be limited to two hours

of sitting, two hours of standing and walking, no carrying and lifting of any amount, no amount of bending, squatting, climbing, reaching up, and only occasional kneeling in an eight-hour day.  R. 1302-03.  In a subsequent questionnaire dated September 7, 2009, Dr. Morris-Harris added that Jones could only sit for five minutes at one time, stand for five minutes at one time, and walk one-half a block at a time.  She stated that Jones would require a cane for walking, require 3-minute walking breaks every 20 minutes, and never be permitted to twist, stoop, crotch, squat, or climb ladders or stairs.  Dr. Morris-Harris also estimated that Jones would require "more than four" absences from work per month.  R. 1427-29.  The ALJ rejected Dr. Morris-Harris' assessment of Jones' physical capabilities, noting that Jones did not begin using a cane until around May 2008.  R. 129.  Dr. Morris-Harris' assessment of physical capacity also conflicts with an earlier RFC assessment dating back to March 21, 2007 by John Durfor, M.D. ("Dr. Durfor"), R. 839, which affirmed that Jones had maintained the same level of RFC since November 27, 2006, when Scott Spoor, M.D. ("Dr. Spoor"), assessed Jones to have the ability to carry 10 pounds frequently and 20 pounds occasionally, sit, stand or walk about 6 hours out of an 8-hour work day, and function without postural or manipulative limitations.  R. 708-14.  Other record evidence would permit the finding that Jones's musculoskeletal condition remained the same over the course of 2007 and 2008.  R. 1234 (noting, in April 3, 2009 examination, that pain levels had remained at the same intensity since the back pain began in 2007).  Therefore, the ALJ was not required to give controlling weight to Dr. Morris-Harris' opinion of Jones's physical RFC.

Finally, the ALJ discounted Dr. Morris-Harris' June 21, 2009 conclusion that Jones's musculoskeletal limitations began "2 yrs ago" (i.e., around June 2007), R. 1304, and her September 7, 2009 conclusion that the "earliest" that the musculoskeletal limitations could have occurred was "2006," *id.* at 1429, finding them contradictory. The court holds that these two conclusions do not necessarily conflict because, in June 2009, Dr. Morris-Harris was responding to the question, "When did the limitations begin to be disabling[?]" and in September 2009 she was responding to the question, "What is the *earliest* date that the description of symptoms *and limitations* . . . applies?" (first emphasis added; second emphasis in original). Nevertheless, the court must uphold the ALJ's decision not to give controlling weight to Dr. Morris-Harris' opinion to the extent it specifies a 2006 onset date because the opinion is inconsistent with other record evidence. *See, e.g.*, R. 1234 (finding that back pain began after specific incident in 2007 when Jones popped his back while lifting a couch); *cf.* R. 16 (noting evidence of some degenerative changes in the lumbar spine in 2006, but concluding after investigating Jones's medical history that the musculoskeletal impairments were asymptomatic until aggravated in 2007).

## C

Jones contends that, even if the ALJ need not have given controlling weight to Dr. Morris-Harris' opinions, the ALJ was nevertheless obligated to explain the degree of weight given by analyzing the expert opinion under the factors listed in 20 C.F.R. § 404.1527(d).

### 1

Under *Newton*, "absent reliable medical evidence from a treating or examining

physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Newton*, 209 F.3d at 453. "This court has vacated and remanded decisions of the Commissioner when the ALJ has rejected the opinion of a treating physician without explicitly considering the § 404.1527(d) factors and the treating physician's opinion is not controverted by reliable medical evidence from another treating or examining physician." *Parham v. Barnhart*, No. 3:05-CV-1043-D, slip op. at 18 (N.D. Tex. Apr. 28, 2006) (Fitzwater, J.) (citing *Segovia v. Barnhart*, No. 3:04-CV-2246-D, slip op. at 14 (N.D. Tex. Aug. 9, 2005) (Fitzwater, J.); *Sailsbury v. Comm'r*, 2003 U.S. Dist. LEXIS 21327, at *12 (N.D. Tex. Oct. 31, 2003) (Fitzwater, J.)). "*Newton*-type error supports reversal, however, only when there is error and the plaintiff has suffered prejudice." *Id.* at 17-18 (citing *Mettlen v. Barnhart*, 88 Fed. Appx. 793 (5th Cir. 2004) (per curiam) (unpublished opinion) ("In order to obtain reversal, [plaintiff] must show both error and some resulting prejudice.")). "Prejudice can be established by showing that the additional considerations might have led to a different decision." *Id.* at 18 (quoting *Mettlen*, 88 Fed. Appx. at 793) (internal quotation marks omitted).

2

The ALJ concluded that Dr. Morris-Harris' opinions were entitled to "no weight," R. 20, after noting that her opinions on his nausea, diarrhea, and fatigue side effects were inconsistent with Dr. Vorhies' testimony that the diarrhea was unlikely to be a significant problem when there is no evidence of weight loss, R. 67, and his testimony that Jones had

suffered several bouts of anemia, *id.* at 66, which the ALJ interpreted as evidence that the fatigue could be a temporary effect of anemia that has since stabilized, *id.* at 20. Dr. Vorhies, however, was not a treating physician or even an examining physician. He was a testifying ME, and his knowledge of Jones's condition was based on a review of Jones's treatment record. R. 60. And Dr. Vorhies only addressed generally how weight loss could indicate a significant condition, where "significant" was rather circularly defined as "enough to cause him to lose weight," R. 67. Also, contrary to the ALJ's explanation in her decision, there is no indication in the hearing record that Dr. Vorhies took a position on whether Jones's fatigue was caused by anemia. Dr. Vorhies simply noted, based on the record, that Jones had been anemic on several occasions throughout 2006 when he became sick with pneumonia. Dr. Vorhies did not draw any inferences connecting the anemia and the fatigue. R. 65-66.

Therefore, because Dr. Vorhies was not a treating or examining physician, and because his testimony does not controvert Dr. Morris-Harris' specific conclusions, the ALJ was obligated under *Newton* to perform a detailed analysis of Dr. Morris-Harris' views under the five factors set forth in 20 C.F.R. § 404.1527(d).

Here, the ALJ's failure to address the five factors caused Jones prejudice. Had the ALJ acknowledged the importance of the examining and treatment relationships of Dr. Morris-Harris to Jones (especially when contrasted with Dr. Vorhies' lack of personal familiarity as a non-examining physician), she might have been more reluctant to give Dr. Morris-Harris' opinion "no weight." Had the ALJ examined the supportability and consistency of Dr. Morris-Harris' opinion in relation to the other evidence in the record, she

might have recognized that Dr. Vorhies' generalized opinion (i.e., noting that diarrhea is generally unlikely to be debilitating when there is no weight loss) did not specifically contradict Dr. Morris-Harris' findings (i.e., that diarrhea was debilitating *for Jones*). Careful examination of the source, supportability, and consistency of Dr. Morris-Harris' opinion might have aided the ALJ in separating out what was actually supported by expert testimony (e.g., Dr. Vorhies' testimony noting in effect that Jones's fatigue occurred around the same time as Jones's anemic condition) and what was the ALJ's own inference (e.g., her conclusion that the anemia caused the fatigue, which she inaccurately attributed to Dr. Vorhies). The court concludes that such additional considerations might have led to a different decision because giving greater weight to Dr. Morris-Harris' opinion might have led the ALJ to agree with Dr. Morris-Harris' conclusions on the severity of Jones's nausea, fatigue, and diarrhea and have ultimately affected the ALJ's RFC determination. A more limited RFC determination, in turn, might have affected the VE's determination that Jones was capable of performing a significant number of jobs available in the economy, a finding that would directly affect Jones's finding of disability or lack thereof.

3

The ALJ also adopted a physical RFC different from the one proposed in Dr. Morris-Harris' physical RFC assessment. *Compare* R. 21 *with id.* at 1302. The ALJ concluded that Jones had greater physical RFC than what Dr. Morris-Harris had opined, but less than what the medical consultants had determined. *See* R. 707-14 (physical RFC assessment of Dr. Spoor); R. 839 (case assessment form of Dr. Durfor affirming Dr. Spoor's RFC after review

of evidence in file); R. 1282-89 (physical RFC assessment of medical consultant, Leigh McCary, M.D. ("Dr. McCary")). It appears that, as medical consultants, Drs. Spoor, Durfor, and McCary did not have an opportunity to examine Jones firsthand. To support their opinions, they cited results on file from earlier examinations and tests done by others. The ALJ also supported her RFC determination by citing Jones's self-reported back pain levels, R. 878 (reporting between a 6 and 8 on a scale of 1 to 10), *id.* at 1219 (reporting an 8); pointing to nerve conduction test results done in February 28, 2008, *id.* at 846; and citing an October 3, 2007 report, which the ALJ found showed significant improvement in Jones's musculoskeletal condition, *id.* at 22. While the nerve conduction test results, the October 2007 report, and Jones's self-reported pain ratings were obtained through treating and examining physicians, the cited evidence does not appear to contain any opinions by these physicians that would have contradicted Dr. Morris-Harris' assessment. (In fact, Dr. Morris-Harris was one of the physicians who gathered the data.) Rather, the conclusion that "this evidence and nerve conduction studies performed . . . suggest symptomatology that would have precluded the claimant from standing/walking in excess of 4 hours, working without a sit/stand option, climbing ladders/ropes/scaffolds and more than occasionally performing postural maneuvers," R. 22, appears to be the ALJ's own inference, drawn from the raw data in the record. From the court's review of the record, it is not apparent that a treating or examining physician expressed such a conclusion. Because there does not appear to be reliable evidence from a treating or examining source to controvert Dr. Morris-Harris' physical RFC assessments, the ALJ was obligated under *Newton* to perform a detailed

analysis under the five factors set forth in 20 C.F.R. § 404.1527(d) before rejecting Dr. Morris-Harris' physical RFC opinion.

This error is prejudicial and requires reversal because, as before, the consideration of factors such as the examining and treatment relationships of the various competing medical opinions might have altered the outcome of the ALJ's disability determination. Although the ALJ acknowledged that Dr. Morris-Harris was a treating source, R. 19, she did not address this treatment relationship as a significant factor in determining the weight of Dr. Morris-Harris' opinion in relation to the weight accorded to the non-examining physicians' opinions. Had the ALJ decided on the weight to accord Dr. Morris-Harris' opinion after she had given due consideration to the importance of Dr. Morris-Harris' examining and treating relationship, the ALJ might have come to a different conclusion about whether to credit Dr. Morris-Harris' evaluation of the physical RFC over the evaluations of non-examining physicians or the ALJ's own evaluation of the nerve conduction studies and October 2007 report. A physical RFC determination that attributed more limitations to Jones could affect the ALJ's determination at step eight by further limiting the number of jobs that Jones would be able to perform and leading the ALJ to find that Jones cannot perform any substantial gainful activity. Jones was therefore prejudiced.

4

Finally, the ALJ found Dr. Morris-Harris' opinion on the onset date of Jones's musculoskeletal limitations was entitled to "no significant weight," R. 22, finding that two of Dr. Morris-Harris' opinions reported contradictory dates. This finding is not supported

by substantial evidence. As noted above, *see supra* § V(B), these conclusions do not necessarily conflict because Dr. Morris-Harris was responding to different questions. In June 2009, Dr. Morris-Harris was responding to the question, "When did the limitations begin to be disabling[?]" and in September 2009 she was responding to the question, "What is the *earliest* date that the description of symptoms *and limitations* . . . applies?" (first emphasis added; second emphasis in original). *Compare* R. 1304 *with id.* at 1429. A treating physician could logically opine that 2006 was the earliest a patient's symptoms of musculoskeletal limitation could have been observed, but that the patient's limitations did not begin to be disabling until about 2007. There is evidence in the record that cast doubt on the 2006 date, *see, e.g.*, R. 1234 (claimant's explanation to examiner that back pain began after popping his back in 2007 while lifting a couch), but none of it originates from a treating or examining source. Therefore, under *Newton*, the ALJ was required to perform a detailed analysis under the five factors set forth in 20 C.F.R. § 404.1527(d) before rejecting Dr. Morris-Harris' opinion.

This error is prejudicial and requires reversal because the ALJ might have come to a different conclusion about when Jones's disability ended had she given greater weight to Dr. Morris-Harris' opinion that symptoms of musculoskeletal limitations could have existed as early as 2006 and that the limitations could have become disabling as of sometime in 2007. The ALJ might have given greater weight to Dr. Morris-Harris' opinion had she given proper weight to the examining and treatment relationships between Dr. Morris-Harris and Jones, as required under 20 C.F.R. § 404.1527(d)(1) and (2); and if she had engaged in closer

scrutiny of Dr. Morris-Harris' two putatively "contradictory" statements under the consistency factor, as required under 20 C.F.R. § 404.1527(4), she might have come to the conclusion that the two statements do not contradict each other after all.

The court therefore vacates the Commissioner's decision in part and remands this case so that the ALJ can comply with *Newton*.[9]

## VI

Jones argues that the ALJ failed to explain properly how the alleged medical improvement was related to an increase in his ability to do work, because Susan Birks, a VE, did not explain what percentage of the jobs she deemed suitable for Jones would comport with Jones's RFC, R. 54, and the ALJ posed a faulty hypothetical question to the VE that did not incorporate the "moderate difficulties in maintaining concentration, persistence or pace" limitation the ALJ had found, *id.* at 20. Although the first argument is presented as a challenge to step four, it in effect appears to challenge step eight, because a VE's

_____

[9]After complying with *Newton*, the ALJ must proceed with the remainder of the eight-step disability cessation inquiry in light of any revised RFC determinations. Although the ALJ is free, of course, to find on remand that the evidence does not support the conclusion that Jones is disabled, she cannot reach this result without assessing Dr. Morris-Harris' pertinent opinions according to the § 404.1527(d) factors and otherwise complying with this memorandum opinion.

And although the court need not review the ALJ's treatment of step eight because of errors in earlier steps requiring remand, the court notes that the ALJ's statement of the allocation of burden, *see* R. 14 (noting that claimant generally has burden of proving disability at eighth step, but that a limited burden of going forward with the evidence shifts to the Social Security Administration) may need reconsideration in light of the instruction in *Waters* regarding burden of proof in closed-period cases. *See Waters*, 276 F.3d at 718-19 (holding that medical improvement standard, where government has burden of proving that person is no longer disabled, applies in determining cessation date in closed-period cases).

determination of the number of available jobs is part of step eight, not step four.[10]   Although this argument contains two components that present distinct issues, the court need not address either one because the ALJ's consideration of Dr. Morris-Harris' opinions on remand may affect Jones's RFC determination and require a new response from a VE that has been reformulated in a way that materially differs from the one challenged in this appeal.

*   *   *

The Commissioner's decision is AFFIRMED in part and VACATED in part and REMANDED to the Commissioner for further proceedings consistent with this memorandum opinion.

July 5, 2011.

_____
SIDNEY A. FITZWATER
CHIEF JUDGE

---

[10]Subsections (b)(4) and (c)(2) of 20 C.F.R. § 404.1594 make clear that an ALJ must determine whether a medical improvement affects one's ability to do work by comparing the old RFC with the new RFC, not by comparing the VE's opinion of increased number of jobs available.